[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13251

_____

ERIKA L. MCNAMARA,
WILLARD F. WARREN

                                        Plaintiffs-Appellants,

KENNETH BENNETT,
non-party,

                                        Intervenor-Appellant,

*versus*

GOVERNMENT EMPLOYEES INSURANCE COMPANY,

                                        Defendant-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:17-cv-03060-SDM-CPT

_____

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge:

Under Florida law, a plaintiff who brings a bad-faith claim against an insurer for failing to settle a lawsuit against one of its insureds must prove, among other things, that the insurer's conduct caused his loss. And as one means of demonstrating the requisite causation, the plaintiff may show that the insured suffered an "excess judgment" as a result of the insurer's actions. In this case, we must decide whether a qualifying "excess judgment" must be based on a verdict following a trial or, instead, may be predicated on a consent judgment that memorializes a private settlement agreement.

In *Cawthorn v. Auto-Owners Insurance Co.*, this Court held—in an unpublished opinion—that only a judgment that follows a trial and results from a verdict qualifies as an "excess judgment" for bad-faith purposes under Florida law. 791 F. App'x 60, 65 (11th Cir. 2019). The district court in our case relied on *Cawthorn* to conclude that a consent judgment formalizing a settlement between an insured and a third party didn't qualify. We now

hold that *Cawthorn* misinterpreted Florida law and that a consent judgment can qualify for "excess judgment" status. Accordingly, we reverse the district court's decision and remand for further proceedings.

I

While driving Willard Warren's vehicle, Erika McNamara negligently changed lanes and caused a collision that seriously injured Deborah Bennett.[1] At the time of the accident, Warren had a GEICO insurance policy that provided bodily-injury coverage up to $100,000 per person. Both Bennett and GEICO assert that they made offers to settle within policy limits, but the parties never reached a deal. Eventually, Bennett sued Warren and McNamara in Florida state court. Pursuant to its policy contract, GEICO provided Warren and McNamara with a lawyer.

Bennett later served both Warren and McNamara with proposals for settlement pursuant to Fla. Stat. § 768.79, which, as relevant here, permits a plaintiff to make "a demand for judgment" as a means of settling a tort action against an insured defendant. Bennett proposed to settle her claims against Warren and McNamara for $474,000 and $4,740,000, respectively. The proposals were conditioned on two factors: (1) Warren and McNamara had to consent to the entry of final judgments against them in the amounts of the proposals; and (2) GEICO had to confirm that it wouldn't assert

---

[1] Intervenor-Appellant Kenneth Bennett is Deborah Bennett's spouse and court-appointed guardian.

that Warren and McNamara had breached the policy by accepting the proposals.

Warren and McNamara's attorney informed GEICO about the proposals and advised that they were "far below what a jury would award in this case." Given that assessment, he informed GEICO that "[m]y clients are inclined to accept, but cannot do so without assurance from GEICO that [accepting the proposals will] not violate the terms and conditions of their policy." GEICO replied: "Although it should be understood GEICO is not agreeing to be a party to this settlement, we will not assert that your clients have breached their policy contract with us if they wish to accept the Proposals for Settlement as currently written." Both Warren and McNamara accepted the proposals, and "Pursuant to Stipulation," the state court entered final judgments against them.

After the conclusion of Bennett's lawsuit, Warren and McNamara sued GEICO for bad faith, seeking to recover the amounts of the final judgments entered against them that exceeded the $100,000 policy limit. They contended that GEICO had breached its fiduciary duty to them by failing to settle Bennett's case within the policy limit when it had the opportunity to do so. GEICO removed the case to federal court and sought summary judgment.

The district court granted summary judgment to GEICO based on our unpublished *Cawthorn* decision. In that case, a panel of this Court held (1) that to prove causation in an insurer-bad-faith case, a plaintiff must show that the insured suffered an "excess

judgment," *i.e.*, a final judgment that exceeds all available insurance coverage, and (2) that the excess judgment *must* result from "a verdict." 791 F. App'x at 64–65. Thus, the panel concluded, because a "consent judgment" is not preceded by a verdict but, rather, is premised on a voluntary settlement, it cannot, as a matter of law, constitute an "excess judgment." *Id.* at 65. And accordingly, the panel held, causation can't be established in an insurer-bad-faith action, as a matter of law, when the insured is subject only to a consent judgment. *Id.* Following *Cawthorn*, the district court here held that the consent judgments entered against Warren and McNamara weren't qualifying "excess judgments" and, therefore, that they couldn't prove causation in their bad-faith action. Warren and McNamara appealed.[2]

Before us, Warren and McNamara challenge *Cawthorn*'s reasoning, arguing that Florida law doesn't require that a verdict precede an excess judgment as a prerequisite to proving the causation element of an insurer-bad-faith claim. Because the outcome of this case must turn on Florida bad-faith law—not on what this Court might have said in unpublished opinions—we begin by considering whether a consent judgment can constitute an excess

---

[2] We review a district court's grant of summary judgment de novo. *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1189 (11th Cir. 2010) (per curiam). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

judgment under Florida law.  We then turn to *Cawthorn* to determine whether it should affect our analysis.

## II

### A

A bad-faith claim arises when, as a result of the alleged misconduct of his insurer, an insured incurs a liability that is covered by an insurance policy but exceeds the policy's coverage limit.  A bad-faith claim is rooted in the same logic that underlies an ordinary negligence claim, and it comprises four familiar elements: The plaintiff must show (1) that the insurer owed the insured a duty of care, (2) that the insurer breached its duty, and (3) that the breach caused the plaintiff to suffer (4) an injury.  *See Boston Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783, 785 (Fla. 1980) (per curiam).

An insurer owes its insureds a duty of good faith.  *Id.*  For lawsuits brought against an insured, that duty includes giving "fair consideration to a settlement offer that is not unreasonable under the facts, and settl[ing], if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  *Id.*  The insurer breaches its duty by acting in bad faith, and the insured suffers an injury if he incurs a liability that exceeds his insurance coverage.

Importantly, a bad-faith plaintiff must link the insurer's conduct to the insured's injury by proving causation.  In *Perera v. United States Fidelity & Guaranty Co.*, 35 So.3d 893 (Fla. 2010), the

Florida Supreme Court answered several certified questions about causation in third-party bad-faith claims.[3]  The court explained that "the existence of a causal connection is a prerequisite [to a bad-faith claim]—in other words, the claimed damages must be caused by the [insurer's] bad faith." *Id.* at 901.  But, it clarified, there is no single way of proving causation. *See id.*; *see also id.* at 898 n.7. Importantly for our purposes, the court concluded that showing the existence of an "excess judgment" is generally the most straightforward way to prove causation. *Id.* at 899.[4]

---

[3] To be clear, a third-party bad-faith claim arises when an insurer is charged with defending its insured against an injured party's lawsuit, and the insurer fails to reasonably settle within policy limits.  By contrast, a first-party bad-faith claim arises when an insured alleges that his insurer wrongfully denied his claim. *See Fridman v. Safeco Ins. Co.*, 185 So.3d 1214, 1220 (Fla. 2016) (explaining the difference between common-law third-party bad-faith claims and the statutory first-party bad-faith claims).

[4] The court also noted three "functional equivalent[s]" of an excess judgment:

- A *"Cunningham"* agreement, in which the insurer and the injured party agree to try the bad-faith issues first; if no bad faith is found, the injured party agrees to settle for policy limits, thereby preventing the insured from facing an excess judgment;

- A *"Coblentz"* agreement, in which the insured, forced to defend against the injured party's claims on his own, agrees to settle with the injured party for policy limits; the injured party can then sue the insurance company on a bad-faith theory; and

- An "equitable subrogation" situation, in which an excess carrier can bring a bad-faith claim against a primary carrier if the excess carrier incurs damages because the primary carrier acted in bad faith.

In *Perera*, the Florida Supreme Court referenced its earlier decision in *United Services Automobile Association v. Jennings*, which had defined an excess judgment as "'the difference between all available insurance coverage and the amount of the verdict recovered by the injured party.'" *Perera*, 35 So.3d at 902 (quoting *Jennings*, 731 So.2d 1258, 1259 n.2 (Fla. 1999)). Notably, though, in *Perera* there was no "verdict." By contrast, Perera and several insurance companies had entered a "Stipulation to Settle," pursuant to which a state court had entered the final judgment that formed the basis for Perera's bad-faith lawsuit. *Id.* at 896. Ultimately, the Florida Supreme Court found no causation in *Perera* because the final judgment didn't exceed all available insurance coverage and there was no other evidence of causation. *Id.* at 902–04. Notably, though, the court never cast doubt on the idea that a final judgment based on a settlement agreement could constitute proof of causation in a third-party bad-faith action.

More recently—and perhaps more to the point—in *Fridman v. Safeco Insurance Co.*, the Florida Supreme Court expressly held, in the context of a statutory first-party bad-faith action, that "the insured is not obligated to obtain the determination of liability and the full extent of his or her damages through a trial and may utilize other means of doing so, such as an agreed settlement, arbitration,

---

*Perera*, 35 So.3d at 899–901. None of these functional equivalents applies here because there was no agreement between GEICO and Bennett, GEICO provided Warren and McNamara with a lawyer at all times, and there is only one insurance carrier in this case.

20-13251          Opinion of the Court          9

or stipulation before initiating a bad faith cause of action." 185 So.3d 1214, 1224 (Fla. 2016) (emphasis omitted). And significantly, the court further confirmed that "first-party bad faith claims . . . should be treated in the same manner as third-party bad faith claims." *Id.* at 1221.[5] Accordingly, both *Perera* and *Fridman* indicate that a jury verdict is not a prerequisite to an excess judgment in a bad-faith action and that, instead, a plaintiff can base a bad-faith claim on a consent judgment that exceeds available insurance coverage.

Here, Warren and McNamara's available coverage was $100,000. The final judgments entered against them in the amounts of $474,000 and $4,740,000, respectively, constituted excess judgments because they exceeded that coverage. Under Florida law, it doesn't matter that these judgments resulted from stipulated settlements instead of verdicts. Because Warren and McNamara were subject to excess judgments, they could prove causation in their bad-faith case.

**B**

Having concluded that Warren and McNamara's bad-faith lawsuit against GEICO can proceed under Florida law, we turn to our unpublished decision in *Cawthorn*—on which the district court expressly relied—to determine whether it should change our conclusion. It should not and does not.

---

[5] *See supra* note 3.

As a preliminary matter, we pause to reiterate an elemental point: While our unpublished opinions "may be cited as persuasive authority," they "are not considered binding precedent." 11th Cir. R. 36-2. We have said so again and again, but it bears repeating. *See United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013) ("Unpublished opinions are not binding precedent."); *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016) ("In this Court, unpublished decisions . . . are not precedential and they bind no one."). Accordingly, a district court shouldn't simply cite to one of our unpublished opinions as the basis for its decision without separately determining that it is persuasive.[6] Here, the district court did just that—it treated *Cawthorn* as binding authority and failed to determine whether that decision correctly analyzed Florida law. *See McNamara v. GEICO*, 2020 WL 5223634, at \*1, \*3–4 (M.D. Fla. July 29, 2020) (agreeing that *Cawthorn* was "an intervening change of controlling law" and reflexively applying it to decide this case). For reasons we'll explain, *Cawthorn* didn't properly analyze Florida law, and the district court shouldn't have followed it.

In *Cawthorn*, an automobile passenger was injured when his friend, the driver, fell asleep at the wheel and crashed into a

---

[6] That is perhaps particularly true in a case that turns on an issue of state law. *Cf. United States v. Chubbuck*, 252 F.3d 1300, 1305 n.7 (11th Cir. 2001) (noting that even a published opinion of this Court interpreting and applying state law is not binding in the event that an intervening state-court decision contradicts it).

concrete barrier. *See* 791 F. App'x at 61. Subsequently, the passenger and the driver entered into a settlement agreement. *Id.* at 62–63. The insurer paid up to the policy limit but refused to pay the rest, so the passenger brought a bad-faith action. *Id.* at 63. This Court held for the insurer, reasoning that a "judgment" means "a final decision—a verdict—reached by a factfinder," and that an "excess judgment" therefore occurs when a *verdict* exceeds all available insurance coverage. *Id.* at 65. So, it said, a consent judgment like the one entered against the driver there, which didn't result from a verdict, couldn't constitute a qualifying excess judgment. *Id.*

The *Cawthorn* panel based its reasoning on *Jennings*'s footnoted explanation of the term "excess judgment"—again, that it constitutes "the difference between all available insurance coverage and the amount of *the verdict* recovered by the injured party." 731 So.2d at 1259 n.2 (emphasis added). Properly understood, though, Florida law doesn't require that a verdict underlie an excess judgment. First, *Jennings*'s references to "verdict[s]" are explained by the fact that, for the general rule, the court there cited *McLeod v. Continental Insurance Co.*, 591 So.2d 621 (Fla. 1992), which happened to involve a jury verdict. Notably, though, in *Jennings* itself there was no verdict; rather, there was only a stipulated *Cunningham* agreement. *See supra* note 4; *Jennings*, 731 So.2d at 1259. And indeed, the *Jennings* court went on to observe that a stipulated judgment for more than the policy limit "is to be given the same effect in the bad-faith litigation as a final judgment

reached upon a determination at trial." 731 So.2d at 1260. Second, as already explained, *Perera* didn't involve a verdict either, but rather a "Stipulation to Settle," and although the court there ultimately held that causation hadn't been proven, it never suggested that a judgment predicated on a settlement agreement couldn't, in appropriate circumstances, satisfy the causation element of a bad-faith claim. And finally, to repeat, the Florida Supreme Court expressly held in *Fridman* that an insured "is not obligated to obtain the determination of liability and the full extent of his or her damages through a trial," but rather "may utilize other means of doing so, such as an agreed settlement . . . or stipulation before initiating a bad faith cause of action." 185 So. 3d at 1224. Given that backdrop, it is altogether unsurprising that this Court has recognized—in a post-*Cawthorn published* opinion—that under Florida law, "[a] stipulated judgment . . . would be a way to obtain an excess judgment that could be used in a bad faith lawsuit" against an insurer. *Pelaez v. GEICO*, 13 F.4th 1243, 1248 (11th Cir. 2021).

To the extent that Florida (and our own) case law leaves any doubt, common sense resolves it. First, and this much may be obvious, a "verdict" and a "judgment" are different things. *See Perez v. Cir. City Stores, Inc.*, 721 So.2d 409, 411 (Fla. 3d DCA 1998) (explaining that the terms "verdict" and "judgment" shouldn't be confused or equated). A "verdict" is merely "[a] jury's finding or decision on the factual issues of a case." *Verdict*, Black's Law Dictionary (11th ed. 2019). A "judgment," by contrast, is a more robust instrument—namely, "[a] *court's* final determination of the rights

and obligations of the parties in a case." *Judgment*, Black's Law Dictionary (emphasis added). And to be clear, and again to state the obvious, a "consent judgment" is indeed a "judgment"—it is, in particular, "[a] settlement that becomes a court judgment when the judge sanctions it." *Id.* (defining "consent judgment" as an aspect of "judgment" and by reference to the term "agreed judgment"). Accordingly, when the insured is subject to a consent judgment that exceeds the policy limit, he is *legally obligated* to pay that amount and incurs an enforceable legal liability. *See Am. Fire & Cas. Co. v. Davis*, 146 So.2d 615, 619 (Fla. 1st DCA 1962).

Another dose of common sense demonstrates that not only are the terms "verdict" and "judgment" not synonymous, but the latter needn't necessarily follow from the former. If, on *Cawthorn*'s reasoning, an excess judgment must always result from a factfinder's verdict, what of pre-trial *summary* "judgments" entered against policyholders? Are they, too, deprived of excess-judgment status simply because they don't follow a full-blown trial and result in a verdict? That can't possibly be the law.

In addition to the *Jennings* footnote, the *Cawthorn* decision appealed to policy considerations—reasoning, for instance, that if consent judgments could satisfy the causation element of a bad-faith claim, insurance companies would be vulnerable to large payouts: "Insurers would not know whether an insured party and an injured party entered into a consent judgment as adversaries, at arm's length and in good faith, or as friends, making a strategic decision to undermine the insurance company's policy." *Cawthorn*,

791 F. App'x at 65.  But even if we were free to privilege those sorts of policy concerns over a proper understanding of Florida law, we wouldn't be moved by them.  Holding, in accordance with Florida law, that a verdict needn't necessarily precede a qualifying "judgment" will not leave insurance companies unprotected.  For starters, the plaintiff must still prove the other elements of his claim—perhaps most notably, that the insurance company breached its duty by acting in bad faith.  Moreover, a consent judgment will be enforced against an insurer only to the extent that the judgment itself is reasonable in amount and untainted by bad faith on the part of the insured.  *See Steil v. Fla. Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla. 2d DCA 1984).  Finally, to the extent that they matter, there are policy considerations—embedded in Florida law—that point clearly in the other direction.  Namely, were we to embrace a rule requiring a verdict as a prerequisite to an "excess judgment," we would only incentivize litigation, in direct contravention of Florida's public policy favoring settlement.  *See* Fla. Stat. § 768.79; *Sun Microsystems of Cal., Inc. v. Eng'g & Mfg. Sys., C.A.*, 682 So.2d 219, 220 (Fla. 3d DCA 1996) ("The public policy of the State of Florida, as articulated in numerous court decisions, highly favors settlement agreements among parties and will seek to enforce them whenever possible.").

Because *Cawthorn* incorrectly analyzed Florida bad-faith law and is unpersuasive, we decline to follow it.[7]

### III

A final judgment that exceeds all available insurance coverage—regardless of whether it results from a consensual settlement or a jury verdict—constitutes an "excess judgment" that can satisfy the causation element of an insurer-bad-faith claim under Florida law. Because such a judgment existed here, we **REVERSE** the district court's decision and **REMAND** for further proceedings.

---

[7] One final thing: In their briefs to us, the parties squabble over whether GEICO agreed to be bound by the consent judgments entered in favor of Bennett in her suit against Warren and McNamara. That is irrelevant. GEICO wasn't a party to that lawsuit, so naturally it wasn't a party to its settlement. A bad-faith claim accrues upon entry of an excess judgment *against the insured*, regardless of the insurer's agreement to the entry of such judgment. Indisputably, GEICO authorized Warren and McNamara to accept the settlements by agreeing not to assert that they had violated any policy provision by doing so. Nothing more was needed for a bad-faith claim to ensue. *See Steil*, 448 So.2d at 592 (holding that in a case involving a consent judgment, a settlement can be enforced against the insurer so long as it is not "unreasonable in amount or tainted by bad faith").